**IN THE UNITED STATES DISTRICT COURT FOR**
**THE NORTTHERN DISTRICT OF OHIO**
**EASTERN DIVISION AT YOUNGSTOWN**

FILED

OCT - 9 2018

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
YOUNGSTOWN

JOHN ANTHONY BUCHANAN    :
619 SADDLE ROCK DR    :
HOUSTON, TEXAS 77037    :
(281) 619-3732    :
BUCHANANJOHN280@GMAIL.COM    :

    PLAINTIFF,    :    4 : 18 CASE NO. CV 2343

Vs.    :

HARBOR PET CENTER    :    **COMPLAINT**
(DBA "I.R.A. PETS, INC")    :    **(JURY TRIAL REQUESTED)**
7338 MARKET STREET,    :
BOARDMAN, OHIO 44512    :    **JUDGE PEARSON**
(330) 758-4950    :    **MAG. JUDGE LIMBERT**

    DEFENDANT,    :

## I.    INTRODUCTION

1.    This is an action for an award of compensatory and punitive damages, and other relief by the Plaintiff, John Anthony Buchanan ("Plaintiff'), pro se, a former employee of Harbor Pet Center, DBA, I.R.A. PETs Inc. ("Defendant"), who has been harmed by the Defendant's discriminatory employment practices.

2.    This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e), etseq., as amended by the Civil Rights Act of 1991, at 42 U.S.C. §1981(a) ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. §12101, etseq. ("ADA"), the Ohio Equal Pay Act, R.C. 4111.17 etseq, and Ohio's Unlawful Discriminatory Practices Act, R.C. 4112.02.

## II.    JURISDICTION AND VENUE:

3. The jurisdiction of this Court is invoked, and venue is proper in this district, pursuant to 28 U.S.C. §§1331 and 1391 as Plaintiffs claims are substantively based on Title VII and the ADA.

4. The supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367 to consider Plaintiffs claims arising under the Ohio Equal Pay Law, R.C. 4111.17 etseq, and Ohio's Unlawful Discriminatory Practices Act, R.C. 4112.02.

5. All conditions precedent to the institution of this suit have been fulfilled and Plaintiff has satisfied all jurisdictional prerequisites to the maintenance of this action. On August 01, 2018, a Notice of Right to Sue was issued by the Equal Employment Opportunity Commission and this action has been filed within ninety (90) days of receipt of said notice.

## II. Parties

6. The Plaintiff, John Anthony Buchanan, is a former Below-the-knee Amputee, African American, Halfway house resident of Community Corrections Association ("CCA") employee, employed by Harbor Pet Center from on or around May 23, 2017 to October 14, 2017, whose primary job duties consisted of that of a "Mascot" and "Kennel Technician," making a minimum wage under Ohio Law[1] of $8.15/hr.

7. The Defendant, Harbor Pet Center is an Ohio Corporation in the retail pet and pet supply Business doing business as ("D.B.A.") I.R.A. Pets Inc., under Ohio Law, maintaining its place of business at 7338 Market Street, Boardman, Ohio, 44512.

8. At all times relevant hereto, the Defendant was acting through its agents, servants, and employees, who were acting within the scope of their authority, course of their employment, and under the direct control of the Defendant.

---

[1] Ohio Revised Code *Chapter 4111, et seq.* MINIMUM FAIR WAGE STANDARDS.

9. At all times material herein, the Defendant is and has been a "person" and "employer" as defined under the ADA, Title VII, and the Ohio Equal Pay Law ("OEPL"), R.C. 4111.17 etseq, and Ohio's Unlawful Discriminatory Practices Act ("OUDPA"), R.C. 4112.02, and is accordingly subject to the provisions of each said act.

### III. STATEMENT OF FACTS

### A. INITIAL DISCRIMINATION IN COMPENSATION

10. The Plaintiff began working for Harbor Pet Center ("Harbor") in the month of May of 2017.

11. He was chosen for the job through an employment program provided by CCA, a halfway house located in Youngstown, Ohio, and regulated by the State of Ohio. The program was developed as an aspect of the Transitional Control Program ("TC") established by the enactment of Ohio Revised Code Sec. 2967.26.

12. To provide some perspective, when the Plaintiff initially began to work for Harbor, he spoke with the General Manager, Kerry Renshaw ("GM"), a white female, who made the ultimate hiring decision and explained, what the Plaintiff feels and believes, was a biased, perfunctory synopsis of the duties and compensation for the position for which he was hired.

13. At the date of the Plaintiff's interview, which was also the day he began to work for Harbor, the GM made numerous statements as to how he would be compensated regarding the position for which he was hired.

14. When the Plaintiff was hired, the GM told him that, as the Mascot (Sign holder), he would be paid the State Minimum wage (at the time ($8.15)) his first thirty (30) days, and his pay rate would increase to $9.15 and in six (6) months in that position, $10.00/hr.

15.     In addition to that aspect of compensation, the plaintiff was told that he would receive (being that his employment with Harbor began during spring) additional compensation (in addition to his base pay rate of $8.15/hr.) according to the weather at the time of performing his job duties as the mascot.

**B.     FIRST INCIDENT OF DISCRIMINATION IN COMPENSATION**

16.     As the Plaintiff began to work at Harbor, he realized that he was not receiving the additional compensation on the days when the temperature was in excess of a day suitable for the mascot costume.

17.     The mascot costume used by Harbor is a puppy costume made from a material that the Plaintiff is unable to identify at this time. Because of the material, the costume can become a hazard to the person wearing it during hot days.

18.     Remembering that he should receive additional compensation on the days the temperature is in excess of 80 to 90 degrees, triggering the obligation of Harbor to provide the additional compensation, the Plaintiff explained to one of the owners, Ray Greenwood ("Owner #1"), a white male, that it was becoming extremely hot within the suit in an attempt to prompt him to apply the additional compensation the Plaintiff was promised by the GM upon hiring.

19.     While speaking with Ray, instead of applying the additional compensation aspect to the Plaintiff as other mascots, Ray informed the Plaintiff that he could remove the costume and don one of Harbor's shirts and return to the corner of Market Street and U.S. State Route 224 where he performed his job duties.

20.     In addition to that, the Plaintiff reached his thirty (30) day anniversary as an employee with Harbor. Although the Plaintiff achieved this milestone, he did not receive the

automatic raise he was promised by the GM, leading him to believe that he was being discriminated against due to his race of African American by the employer Harbor.

## C. DISCRIMINATION FOR REQUESTING REASONABLE ACCOMODATION IN SCHEDULE AND RETALIATORY/DISCRIMINATORY REDUCTION IN HOURS AND HARRASSMENT THROUGH CONSTRUCTIVE DISCHARGE

21. As mentioned earlier, when the Plaintiff began working for Harbor, he was a resident of CCA. As a benefit of the TC program, CCA provides its residents with rides to and from the resident's place of employment. The Plaintiff was released from CCA on August 9, 2017.

22. Because of this, the Plaintiff was no longer a resident of CCA and, therefore, is unable to enjoy the perks of the program; including the perk of having a reliable source of transportation to and from work, interfering with his availability to work at Harbor on certain days and times.

## 1. PLAINTIFF NOTTIFIES OWNER #2 OF CHANGE IN AVAILABILITY AND REQUEST FOR ACCOMMODATION

23. On August 25, 2017, the Plaintiff contacted another owner of Harbor, Ian Pethtel ("Owner #2"), a white male, via text message, notifying him of his change in availability. Owner #2 never responded to the Plaintiff's request for accommodation in his scheduling.

24. The Plaintiff stated, verbatim, this request to Owner #2: "Hey Ian. I need to discuss some issues I'm having with getting to and from work. Since I'm not in CCA anymore, my availability has changed. I no longer have the ability to work late hours. I currently live in Struthers. The bus there only runs every hour and the last bus for the Buckeye route is 6pm.[2]

---

[2] For more information on the truth of this, please visit
http://www.wrtaonline.com/schedules/route-16-buckeye/.

That means I have to be able to get off by 5. This means that from Monday thru Saturday I can work anytime you need me thru the week until 4:30. On Sundays I cannot catch the bus because it does not run. Please work with me until I get my license back which will happen once I finish my bankruptcy. Thank you in advance."

## 2    PLAINTIFF NOTIFIES OWNER #1 OF CHANGE IN AVAILABILITY AND REQUEST FOR ACCOMMODATION

25.    On August 25, 2017, the Plaintiff contacted Owner #1, via text message, notifying him of his change in availability. Owner #1 responded to the Plaintiff's request for accommodation in his scheduling by stating, verbatim: "Ok talk with Ian today about it and than (sic) we will adjust your schedule."

## 3.    DISCRIMINATORY TREATMENT BY GM AND CONSTRUCTIVE DISCHARGE BASED ON THE PLAINTIFF'S RACE AND EXERCISE OF HIS ACCOMMODATION IN HIS SCHEDULING

26.    On August 25, 2017, at 1:16p.m., the GM contacted the Plaintiff, via text message, with the following question, verbatim: "Were you off today?" In response, the Plaintiff stated, verbatim: "No I'm on my way. I was scheduled for 3 to 8. Why did I do something wrong?"

27.    The GM continued to communicate with the Plaintiff in a very peculiar manner causing him to become suspicious as to why she was contacting him. The next couple statements the GM made confirmed the Plaintiff's suspicions. The GM stated, verbatim: "Nope just seeing if you needed a ride." The Plaintiff responded verbatim: "Thank You but I'm on the bus now. I'll be there shortly."

28.    The GM responded to the Plaintiff in a more peculiar way that made the Plaintiff uneasy and feel like he was being baited into making a statement against his request for

accommodation. Specifically, the GM stated, verbatim: "No problem I'm just looking for reason to get the fuck out of work." This statement caused the Plaintiff to feel as if he was being played against his interest of loyalty to the company and not offending the hiring/firing manager. The GM continued with, verbatim: "Lmao." The Plaintiff responded by saying, verbatim: "Oh. I didn't know sorry should have called you then. Lol."

### a)     Plaintiff Receives Approval from Owner #3 of his Scheduling Accommodation

29      Upon arriving to Harbor for his scheduled shift, the Plaintiff spoke with Owners #1, 2, and, 3. Owner #3 is Amanda, a white female. Upon having this conversation, the owners agree with the schedule adjustment, and the Plaintiff was told by Owner #3 that he was permitted to leave early when his bus schedule did not permit for longer hours.

30.      At 3:51p.m., right at the time the Plaintiff was clocking out to end his shift in accordance with his schedule modification, the GM contacted the Plaintiff, via text message, stating, verbatim: "I was going to try to take you at 8 tonight so I can leave early too lol."

31.      This caused the Plaintiff great concern as to the motives of the GM. It appeared that she had some nefarious, discriminatory, retaliatory plan brewing to undermine the Plaintiff's scheduling accommodation. The Plaintiff responded to the GM, verbatim: I know. Sorry don't want to be [a] burden. You all have helped enough."

### b)     GM retaliates and Harasses the Plaintiff for Utilizing his Scheduling Accommodation

32.      The GM responded to the Plaintiff, verbatim: "Your (sic) not a burden and I need you out there until your (sic) scheduled I don't mind bringing you home." The Plaintiff did not respond to this as he felt that it had a retaliatory/discriminatory animus behind it.

33.     At 6:58p.m., the GM contacted the Plaintiff, via text message, stating, verbatim: "Did you leave?" This caused the Plaintiff to become suspicious. The GM was made aware of the Plaintiff's scheduling accommodation and appeared to be retaliating against the Plaintiff by making this inquiry, as if to create a pretext for which to initiate disciplinary proceedings against the Plaintiff to negate his scheduling accommodation.

34.     The Plaintiff's concerns were confirmed when the GM texted the Plaintiff and said, verbatim: "I thought I told you (sic) had to stay until your scheduled time…" This statement caused the Plaintiff great discomfort and mental anguish, as, at the time, the Plaintiff was renting a room with a room mate for $300.00 a month and did not want to lose his position with Harbor.

35. The Plaintiff responded to the GM by saying, verbatim: "No." The GM responded by saying, verbatim: No what?" At that point, the Plaintiff explained to the GM that: "Amanda [Owner #3] told me that I would not get in trouble when I need to catch the bus. So (sic) I told you I needed to catch the bus home."

36.     As shown by the GM's statement, she made statements that made the Plaintiff believe that Harbor would work with him in an attempt to accommodate him for his changing circumstances; also, being that that the plaintiff is a below-the-knee amputee (Trans-Tibia), it would be difficult to have to walk extremely long distances, after having to work upwards to eight (8) hour long shifts dancing.

## 4.     HARBOR CUTS PLAINTIFF'S HOURS AND HIRES WHITE MASCOT TO REPLACE HIM

37.     Harbor allowed the Plaintiff to work the hours from the schedule accommodation for a short period of time. The Plaintiff believes that Harbor only let him work those hours until

they hired someone else. Harbor eventually hired Timothy Wamsly ("Wamsly"), a white male and immediately cut the Plaintiff's hours, effectively reneging on their agreement to adjust the Plaintiff's schedule.

38. The Plaintiff believes this occurred for retaliatory/discriminatory reasons. The GM is the person who made the decision to hire Wamsly. This can be inferred from the hostile tone within her text messages when the Plaintiff initially began to utilize the schedule accommodation.

39. The Plaintiff asked for an accommodation to help with his transportation situation affecting his availability and disability, which Harbor agreed to accommodate. The fact that Harbor hired a White male to replace him, made the Plaintiff feel that it was also motivated by the fact of his African American/black race.

40. The action of hiring a white mascot and reducing the Plaintiff's hours were done intentionally to harass, discriminate, and retaliate and force the Plaintiff to become uncomfortable with working with Harbor, so that he would quit. Constructive discharge.

**D.     HARASSMENT and CONSTRUCTIVE DISCHARGE LEADING TO ADVERSE ACTION OF TERMINATION**

41. After hiring Wamsly, Harbor began to do things to get the Plaintiff to quit. Once the Plaintiff seen Harbor hire Wamsly, he became upset and began to question the owners and the GM about his compensation and hours. The Plaintiff strongly believes that these actions were motivated by the fact the Plaintiff is a disabled, African American male attempting to exercise his right.

42. On one particular day, the Plaintiff approached the GM and inquired as to why he was not being paid as promised during the hiring process. The GM acted as if she did not use

those perks to get the Plaintiff to accept the position. Upon inquiring, she made a disapproving face, and told the Plaintiff that he needed to speak with Owner #1.

43. At that point, the Plaintiff realized that he was not intended to be a permanent employee at Harbor. This was inferred from the fact that Plaintiff was one of the three (3) African American males who worked at Harbor. That is when it became clear to the Plaintiff that he was being systematically harassed and retaliated against so that he could get frustrated and quit on his own in an attempt to prevent Harbor from being liable for wrongful termination.

### 1. HARBOR BEGANS TO SCHEDULE PLAINTIFF IN CONFLICT WITH HIS SCHEDULE ACCOMMODATION AS A MEANS OF CONSTRUCTIVE DISCHARGE

44. As time went by, Harbor began to schedule the Plaintiff at times that clearly conflicted with his schedule accommodation, which they were aware of. The GM started to become much more scrutinizing regarding the Plaintiff's performance as to create a pretext to justify firing the Plaintiff. The proof of the retaliatory/discriminatory scheduling is attached as an exhibit.

45. In addition to this, Harbor changed the Plaintiff's job duties from Mascot to "Kennel Technician." In response to the Plaintiff's inquiries, Harbor began to schedule the Plaintiff at times to work in the kennel with a teenage boy named Llayn Gianotti ("Llayn"), a white male.

46. Although Llayn has Autism or some other disabling condition, on the days he works in the kennel, Llayn does not perform his job duties within the scope of the description.

47. Specifically, the job duties of kennel technician require constant focus and attention on job duties to prevent becoming behind. These duties encompass, just to name a few, bathing puppies, cleaning bowls, toys, grates and trays, and the administering of medication to

sick puppies. This requires two people of equal qualification to do this position to prevent a disparity in duties.

48.     The Plaintiff believes that this was being done to harass him and cause him frustration. Each of the employees who have worked with Llayn have complained about his inability to stay focused and complete job duties, placing the burden on whomever is left ,after his (Llayn) shift to pick up the slack absent any additional compensation.

49.     Llayn, being Autistic, is unable to stay focused on his kennel tasks. He is repeatedly reprimanded for his actions, but still does the same acts week after week without any corrective/disciplinary action being taken, harming the Plaintiff and others who may have to work with him.

50.     Harbor has a progressive Discipline Policy. Under that policy, such actions should have rose to the level of supporting termination of employment. Also, on the days Llayn is scheduled, before he leaves his post, his job duties are never complete before the ending of his shift. This action can lead to termination, but Llayn doesn't get reprimanded in accordance with Harbor Policy, affecting others who will be terminated for such behavior. For support, please see an accurate copy of Harbor's Employee Handbook in effect at the time of Plaintiff's employment.

## 2.     HARBOR TAKES ADVERSE ACTION OF TERMINATION AGAINST THE PLAINTIFF AND RETALIATION

51.     On Oct. 14, 2017, Harbor scheduled the Plaintiff on a Saturday, conflicting with his schedule accommodation, to work the Kennel from 12p.m. to 9:30p.m. Prior to this date, the Plaintiff approached several of his superiors including the Kennel Manager and the GM, and explained that he could get to work on Saturday, but would be unable to get home, as explained

in the attached documents. The Plaintiff was informed that it would be taken care of but was never done.

52.    On that date, as shown by the attached copy of Harbor's Employee Schedule, the Plaintiff was scheduled in the Kennel for a very long time with no one to assist him. The Plaintiff strongly believes that this was done in an attempt to cause him anxiety, frustration, and to discriminate and retaliate against him for being a Disabled, African American male who utilized his right to request a reasonable accommodation.

53.    Upon entering the store, the Plaintiff approached the GM and explained to her about his availability and asked if he would be provided a ride at the end of his shift because he would have to walk from Boardman, Ohio to Struthers/Youngstown, Ohio, which is approximately 5.8 mi.

54.    The GM became irate and started to yell at the Plaintiff in an attempt to get him to stop inquiring about the issue. At one point, the GM made a statement that if the Plaintiff did not work until the time he was scheduled, he would be terminated although such an offense is not a terminating offense in its first instance.[3] In addition, the Plaintiff was given a schedule accommodation permitting him to leave early from work to be able to catch the bus.

55.    At that point, the Plaintiff told the GM, with no disrespect, to not schedule him at a time in conflict with his schedule accommodation on a Saturday, because he would be unable to get home. At that point, everyone present was in agreement with the situation, and the Plaintiff clocked in and reported to his post.

_____

[3] As witnesses, Kerry Such, Gregory Naypaver, Devon Washington, and Michael Westhead.

56. Upon entering the Kennel, the Plaintiff noticed that Dakota Hart ("Dakota"), a white female, and Llayn were working.[4] What was strange to the Plaintiff is that Llayn was not scheduled, and Dakota's time had been shorten and Plaintiff was placed in the slot. The Plaintiff strongly believes that this was done in an attempt to cause him anxiety, frustration, and to discriminate and retaliate against him for being a Disabled, African American male who utilized his right to request a reasonable accommodation.

57. At that point, the Plaintiff asked the two of them who was going to remain with him to assist him with Kennel duties. Dakota Hart told the Plaintiff that she was leaving at that time, and Llayn said he was leaving at 2:00p.m.

58. Upon hearing this, seeing Llayn there, without him being scheduled, Dakota Hart leaving, and the Plaintiff being scheduled for the whole time to do all these tasks by himself, the Plaintiff knew this was Harbor's attempt to create working conditions that would create a depressing, unhappy workplace experience to make him quit; or do something to create the pretext needed to terminate his employment.

59. After about an hour and one half into his shift, the Plaintiff began to experience the symptoms of his multiple disabling conditions. (*In 2011, the Plaintiff was diagnosed as being Manic Depressive, Schizophrenic, and Bipolar. These conditions are pervasive and thus limits the Plaintiff's ability to be tolerant of events that others would not be affected by. Also, as a result of being shot by a high-powered assault rifle, the Plaintiff was diagnosed as having PTSD.)[5]

a) **Constructive Discharge Situation and Harassment**

---

[4] I must mention that Dakota Hart is a White Female. As well as all the witnesses listed above; besides, Devon Washington.

[5] Being that the Plaintiff has these conditions, certain tones of voice and other actions cause him to have episodes that will interfere with his ability to perform his job duties.

60.     At that time Brittany Mitcham ("Brittany"), a white female, came on shift. Once Brittany came on shift, she began to make incessant demands to the Plaintiff that he performs tasks, seeing the Plaintiff was already engaged in a task, causing him to become more anxious and frustrated, leading him to experience other physiological responses like his breathing being labored and his stomach becoming upset.

61.     At or about an hour later, the Plaintiff began to experience more symptoms. The demands continued, and the Plaintiff was not given any assistance from anyone. The Plaintiff kept getting yelled at by Brittany who, at one point, appeared to be getting gratification in making the Plaintiff frustrated. The Plaintiff strongly believes that this was done in an attempt to cause him anxiety, frustration, and to discriminate and retaliate against him for being a Disabled, African American male who utilized his right to request a reasonable accommodation.

**b.)     Constructive Discharge Situation, Harassment, Retaliation, and Discrimination by GM**

62.     Feeling like he was being forced to accept Harbor's intentional discrimination, the Plaintiff decided to notify the GM about what he was experiencing as required in Harbor's Employment Handbook. Please see attached copy for proof.

63.     At that point, the Plaintiff went to speak with the GM who was working the register. He told the GM that he needed to speak with her as required in Harbor's Employee Handbook regarding his current health at that time. When the Plaintiff said this to the GM, she told him "Ok. But it's probably going to be a while."

64.     Once this was said, under the pressure of a constructive discharge situation, the Plaintiff told her that it was regarding a medical condition in a way that was snappy, but non-threatening. At that point, the Plaintiff returned to his position.

65. At or about ten (10) minutes later, the GM entered the Kennel at which point, the Plaintiff began to explain to her what was going on. At the conclusion of this conversation, the GM concluded by saying "so, you need to leave." The Plaintiff stated "yes," and the GM told the Plaintiff "That's fine."

66. Once the Plaintiff was given the authorization to leave his job duties, he finished up what he was doing, clocked out, and went home, with the hopes of scheduling an appointment with his doctor for a referral to address the pervasiveness of his symptoms.

## E. THREATS, RETALIATION, and HARASSMENT BY OWNER #1

67. While on the bus, on his way home, the Plaintiff received a call from Owner #1. When the Plaintiff answered the phone, he was very respectful. Owner #1 asked the Plaintiff what had happened. At first, he was calm and receptive to what the Plaintiff was saying.

68. Once the Plaintiff was done explaining why he was forced to leave, and that he had permission from the GM, Owner #1 yelled into the phone "Why did you leave!" When the Plaintiff tried to explain more, Owner #1 interrupted the Plaintiff and said "Well, don't bother coming back. You're done." When he said that, the Plaintiff responded professionally by saying ok and ended the call.

69. After the Plaintiff ended the call with Owner #1, He texted him and asked him what the grounds were for his termination. Specifically, the Plaintiff stated, verbatim: "I'm going to need that in writing also."

70. Owner #1 stated, verbatim: " I also need the medical condition as well in writing as to why you walk (sic) from your job." Upset that the GM lied to Owner #1 and caused him to wrongfully terminate his employment, the Plaintiff texted Owner #1, verbatim: "I'm going to file

suit with the eeoc. (sic) This is a violation of my rights under the ada. (sic) I explained to Kerry [GM] why. I'm not walking away from my job. Now iam (sic) going to sue the company."

71.     Owner #1 responded, verbatim : "yep." The Plaintiff then responded to Owner #1 by saying, verbatim: "I will bring my proof too (sic) you on monday. (sic) I told kerry. [GM] you fired me for no reason."

72.     Owner #1 responded, verbatim : "you walked off the job and you yelled at two managers." He stated further, verbatim: " That is the reason. They wrote statements as well." The Plaintiff responded verbatim by saying : "iam (sic) not a bad employee. I'm sick. Didnt (sic) receive a reprimand. You all have a progressive discipline system. I didnt (sic) yell at anyone. You cant (sic) prove that. There were multiple people around. Im (sic) going to let you all do me like that."

73.     After this exchange, Owner #1 became upset and stated, verbatim: "Do not come to the store at all or you will be arrested. This is all iam (sic) now!" Sensing the discriminatory/retaliatory animus, the Plaintiff responded by saying, verbatim: " So your (sic) ratifying her behavior. Good. You cant (sic) have me arrested or coming to the store as a customer. Im (sic) reporting this. I have proof now."

74.     Owner #1 became upset and stated, verbatim: " Insubordination is a firing situation[.] (sic) does not need reprimand[.] (sic) also[,] (sic) we have statements from all employee[s] (sic) there. No[,] (sic) your (sic) a fired employee."

75.     The Plaintiff then responded, verbatim: "you will all be charged. Its now a conspiracy. Thank you for the opportunity sir. If you alter any of the video footage I will charge you with spoliation of evidence. Im (sic) going to subpoena your records to court and video footage of this day. * * *." Owner #1 did not respond to the Plaintiff.

76.     Feeling like his termination was retaliatory, discriminatory, and unrelated to his (Plaintiff) alleged misconduct, the Plaintiff continued to stress to the Defendant that the grounds for termination are not a firing incident in its first instance, the Plaintiff stated, verbatim: "This is why I (sic) said that about the progressive discipline aspect of your compnay's (sic) Employment Policies. I hate that things turned out this way. I thought you were different from all the others that treat me like a retard. It's not personal sir. I have rights Mr. Ray. Its Kerry Renshaw's fault that this happened sir. Please don't (sic) believe her. She deserves to be reprimamded (sic) for her actions against me and others. She was very unprofessional today by telling you I (sic) walked out when she knows that I (sic) approached her and explained. She told me ok when she asked could [did] i[wish to] leave. You don't (sic) need a dishonest gm (sic) like that (sic) sir. I have never disrespected you sir. Kerry is harassing me and retaliating against me because she initially told me that I (sic) would get an automatic raise of $9.15 after thirty days. I have not seen that. Kerry Renshaw is the one tp (sic) blame sir. I did noy (sic) just walk and abandoned my job. Kerry Rensdhaw told me I (sic) can (sic) leave. She said, in her words, "ok." Sorry sir for this. Good luck in all future business endeavors. Thank you again sir."

**COUNT I**
**(Title VII- Race Discrimination, Unequal Compensation)**
**Plaintiff Buchanan v. Defendant**

77     Plaintiff John Anthony Buchanan ("Plaintiff Buchanan") incorporates by reference paragraphs 1 through 20 as though fully set forth at length herein.

78.     The Defendant subjected Plaintiff Buchanan to discrimination in his compensation by paying him less than white/other mascots and failing to increase his pay as normally done based on his race/color as being black/African American, as detailed above.

79. Rather than cause the discriminatory compensation to cease, Defendant reduced Plaintiff Buchanan's hours as mascot and hired a white guy in his place and created a unhealthy work environment to constructively discharge and terminate Plaintiff Buchanan's employment, allegedly due to an altercation with two mangers. However, Defendant's reason for Plaintiff Buchanan's reduction in hours, hiring of white, and termination are pretextual, and his employment was actually terminated because of his race/color.

80. Accordingly, Defendant's discriminatory acts have deprived Plaintiff Buchanan of equal employment opportunities because of his race/color in violation of Title VII.

81. As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of Title VII, Plaintiff Buchanan sustained permanent and irreparable harm, resulting in the loss of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

## COUNT II
### (Title VII- Race Discrimination, Reduction in Hours and Hiring of White Mascot)
### Plaintiff Buchanan v. Defendant

82. Plaintiff Buchanan incorporates by reference paragraphs 1 through 76 as though fully set forth at length herein.

83. The Defendant subjected Plaintiff Buchanan to discrimination by reducing his hours as mascot and hiring a white guy in his place based on his race/color as being black/African American, as detailed above.

84. Rather than allow the Plaintiff to work the schedule that he was given as an adjustment, Defendant reduced his hours as mascot and hired a white guy in his place.

85. Accordingly, Defendant's discriminatory acts have deprived Plaintiff Buchanan of equal employment opportunities because of his race/color in violation of Title VII.

86. As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of Title VII, Plaintiff Buchanan sustained permanent and irreparable harm, resulting in the loss of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

## COUNT III
### (Title VII- Race Discrimination, Constructive Discharge)
### Plaintiff Buchanan v. Defendant

87. Plaintiff Buchanan incorporates by reference paragraphs 1 through 76 as though fully set forth at length herein.

88. The Defendant subjected Plaintiff Buchanan to discrimination by creating unbearable working conditions to constructively discharge the Plaintiff based on his race/color as being black/African American, as detailed above.

89. Rather than cause the discriminatory compensation to cease, Defendant created an unbearable work environment to constructively discharge and terminate Plaintiff Buchanan's employment, allegedly due to an altercation with two mangers. However, Defendant's reason for Plaintiff Buchanan's termination is pretextual, and his employment was actually terminated because of his race/color.

90. Accordingly, Defendant's discriminatory acts have deprived Plaintiff Buchanan of equal employment opportunities because of his race/color in violation of Title VII.

91. As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of Title VII, Plaintiff Buchanan sustained permanent

and irreparable harm, resulting in the loss of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

**COUNT IV**
**(Title VII- Retaliation)**
**Plaintiff Buchanan v. Defendant**

92. Plaintiff Buchanan incorporates by reference paragraphs 1 through 76 as though fully set forth at length herein.

93. The actions of Defendant, through its agents, servants, and employees, in subjecting Plaintiff Buchanan to retaliation for being a black/African American who complained about his compensation, constituted a violation of Title VII.

94. Defendant terminated Plaintiff Buchanan's employment in retaliation for him notifying his superior that he was having a medical emergency and requested to leave his job and was granted permission.

95. The reason articulated for Plaintiff Buchanan's termination is pretextual, and his employment was actually terminated in retaliation for notifying his superior that he was having a medical emergency and requested to leave his job and was granted permission.

96. As a direct result of the aforesaid unlawful retaliatory practices engaged in by the Defendant in violation of Title VII, Plaintiff Buchanan sustained permanent and irreparable harm, resulting in the loss of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

97.     As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendant in violation of Title VII, Plaintiff Buchanan suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT V
### (ADA- Disability Discrimination, Failure to Accommodate)
### Plaintiff Buchanan v. Defendant

98.     Plaintiff Buchanan incorporates by reference paragraphs 1 through 76 as though fully set forth at length herein.

99.     The actions of the Defendant, through its agents, servants and employees, in discriminating against Plaintiff Buchanan on the basis of his actual and/or perceived disabilities and/or record of impairment, and failing to provide reasonable accommodation for his disability, constituted violations of the ADA.

100.    As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of the ADA, Plaintiff Buchanan sustained permanent and irreparable harm, resulting in his termination from employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

101.    As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of the ADA, Plaintiff Buchanan suffered severe emotional distress, embarrassment, humiliation, and loss of selfesteem.

## COUNT VI
### (ADA - Retaliation)
### Plaintiff v. the Defendant

102.    Plaintiff incorporates by reference paragraphs 1 through 70 of his Complaint as though fully set forth herein.

103. The actions of the Defendant, through its agents, servants and employees, in retaliating against Plaintiff Buchanan for requesting a reasonable accommodation, getting it and using it, and for opposing unlawful racial and disability discrimination in the workplace, constituted a violation of the ADA.

104. As a direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendant in violation of the ADA, Plaintiff Buchanan sustained permanent and irreparable harm resulting in the termination of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, front pay, and interest due thereon.

105. As a further direct result of the aforesaid unlawful retaliatory employment practices engaged in by the Defendant in violation of the ADA, Plaintiff Buchanan suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

**COUNT VII**
**(OEPL - Race Discrimination, Unequal Compensation)**
**Plaintiff v. the Defendant OUDPA**

106. Plaintiff John Anthony Buchanan ("Plaintiff Buchanan") incorporates by reference paragraphs 1 through 20 as though fully set forth at length herein.

107. The Defendant subjected Plaintiff Buchanan to discrimination in his compensation by paying him less than white/other mascots and failing to increase his pay as normally done based on his race/color as being black/African American, as detailed above.

108. Rather than cause the discriminatory compensation to cease, Defendant reduced Plaintiff Buchanan's hours as mascot and hired a white guy in his place and created a hostile work environment to constructively discharge and terminate Plaintiff Buchanan's employment, allegedly due to an altercation with two mangers. However, Defendant's reason for Plaintiff

Buchanan's reduction in hours, hiring of a white mascot, and termination is pretextual, and his employment was actually terminated because of his race/color.

109. Accordingly, Defendant's discriminatory acts have deprived Plaintiff Buchanan of equal employment opportunities because of his race/color in violation of OEPL.

110. As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of OEPL, Plaintiff Buchanan sustained permanent and irreparable harm, resulting in the loss of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

## COUNT VIII
### (OUDPA - Race Discrimination, Unequal Compensation)
### Plaintiff v. the Defendant

111. Plaintiff John Anthony Buchanan ("Plaintiff Buchanan") incorporates by reference paragraphs 1 through 20 as though fully set forth at length herein.

112. The Defendant subjected Plaintiff Buchanan to discrimination in his compensation by paying him less than white/other mascots and failing to increase his pay as normally done based on his race/color as being black/African American, as detailed above.

113. Rather than cause the discriminatory compensation to cease, Defendant reduced Plaintiff Buchanan's hours as mascot and hired a white guy in his place and created a hostile work environment to constructively discharge and terminate Plaintiff Buchanan's employment, allegedly due to an altercation with two mangers. However, Defendant's reason for Plaintiff Buchanan's reduction in hours, hiring of white, and termination is pretextual, and his employment was actually terminated because of his race/color.

114.    Accordingly, Defendant's discriminatory acts have deprived Plaintiff Buchanan of equal employment opportunities because of his race/color in violation of OUDPA.

115.    As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of OUDPA, Plaintiff Buchanan sustained permanent and irreparable harm, resulting in the loss of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

## COUNT IX
### (OUDPA - Race Discrimination, Reduction in Hours and Hiring of White Mascot)
### Plaintiff Buchanan v. Defendant

116.    Plaintiff Buchanan incorporates by reference paragraphs 1 through 76 as though fully set forth at length herein.

117.    The Defendant subjected Plaintiff Buchanan to discrimination by reducing his hours as mascot and hiring a white guy in his place based on his race/color as being black/African American, as detailed above.

118.    Rather than allow the Plaintiff to work the schedule that he was given as an adjustment, Defendant reduced his hours as mascot and hired a white guy in his place.

119.    Accordingly, Defendant's discriminatory acts have deprived Plaintiff Buchanan of equal employment opportunities because of his race/color in violation of OUDPA.

120.    As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of OUDPA, Plaintiff Buchanan sustained permanent and irreparable harm, resulting in the loss of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

## COUNT X
### (OUDPA - Race Discrimination, Constructive Discharge)
### Plaintiff Buchanan v. Defendant

121.     Plaintiff Buchanan incorporates by reference paragraphs 1 through 76 as though fully set forth at length herein.

122.     The Defendant subjected Plaintiff Buchanan to discrimination by creating unbearable working conditions to constructively discharge the Plaintiff based on his race/color as being black/African American, as detailed above.

123.     Rather than cause the discriminatory compensation to cease, Defendant created an unbearable work environment to constructively discharge and terminate Plaintiff Buchanan's employment, allegedly due to an altercation with two mangers. However, Defendant's reason for Plaintiff Buchanan's termination is pretextual, and his employment was actually terminated because of his race/color.

124.     Accordingly, Defendant's discriminatory acts have deprived Plaintiff Buchanan of equal employment opportunities because of his race/color in violation of OUDPA.

125.     As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant in violation of OUDPA, Plaintiff Buchanan sustained permanent and irreparable harm, resulting in the loss of his employment, which caused him to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

## IV.     PRAYER FOR RELIEF

126.     Plaintiff Buchanan incorporates by reference paragraphs 1 through 125 of his Complaint as though fully set forth at length herein.

**WHEREFORE,** Plaintiff Buchanan requests that this Court enter judgment in her favor and against the Defendant, and order that:

a.　Defendant compensate Plaintiff Buchanan with a rate of pay and other benefits and emoluments of employment to which he would have been entitled had he not been subjected to unlawful discrimination.

b.　Defendant compensate Plaintiff Buchanan with an award of front pay, if appropriate;

c.　Defendant pay to Plaintiff Buchanan punitive damages, compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses as allowable;

d.　Defendant pay to Plaintiff Buchanan, pre and post judgment interest, costs of suit and attorney and expert witness fees as allowed by law;

e.　The Court award such other relief as is deemed just and proper.

**DATE:** October 2, 2018

**RESPECTFULLY SUBMITTED,**

**JOHN ANTHONY BUCHANAN**
**PLAINTIFF, PRO SE**
**619 SADDLE ROCK DR.**
**HOUSTON, TEXAS 77037**
**BUCHANANJOHN280@GMAIL.COM**